UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

UNITED STATES OF AMERICA    )
    )
    )
vs.    )    4:07-CR-12
    )    MATTICE/CARTER
    )
JUSTIN EAVES    )

## REPORT AND RECOMMENDATION

### I.  Introduction

Defendant Justin Eaves' Motion to Suppress Evidence (Doc. No. 12) is before the undersigned Magistrate Judge having been referred by the District Court for a report and recommendation pursuant to 28 U.S.C.§ 636(b)(1)(B)&(C).  The defendant seeks to suppress evidence of illegal drugs found inside a camper located at 298 Camargo Road, Fayetteville, Tennessee in Lincoln County.  For the reasons stated herein, the undersigned concludes law enforcement officers violated the Fourth Amendment's prohibition against unreasonable searches and, therefore, it is RECOMMENDED that the defendant's motion to suppress be GRANTED.

### II. Relevant Facts

An evidentiary hearing was held before the undersigned Magistrate Judge on Thursday, October 11, 2007.  The government called Debbie Farris of A-Action Bonding, Chief Deputy Bill Reavis of the Lincoln County Sheriff's Department, Sheriff Murray Blackwelder of the Lincoln County Sheriff's Department, and Alcohol, Tobacco and Firearm (ATF) Special Agent Stephen Gordy to testify for the government.  Dorothy Mushenski, Shawna Poole, and Jonathan Poole testified on behalf of the defendant.  The rule of sequestration was observed.

*Debbie Farris*

Debbie Farris (Farris) testified to the following: She has been employed as a bounty hunter and fugitive recovery specialist with A-Action Bonding in Columbia, Tennessee for the past three and one-half years. On September 26, 2006, Farris was assisting her boss, Mr. Bloss (Bloss), and another bonding agent, Mickey Cantrell (Cantrell), in looking for Mr. Eaves who had failed to appear for a court appointment. Bloss and Farris received  information from a confidential informant (CI) that the defendant and his girlfriend were walking around a "trailer" at 298 Camargo Road in Fayetteville, Tennessee in Lincoln County.  Farris, Bloss and Cantrell contacted the Lincoln County Sheriff's Department and then drove to 298 Camargo Road, Fayetteville, Tennessee, to attempt to apprehend the defendant.  They drove up on a road that curves behind the property and met the CI who had been lying in the woods watching the defendant walk around the property.  There were two mobile homes, a camper, some type of cargo trailer, and a utility shed located on the property where the defendant had been seen.  When facing the property from the front property line, there was one mobile home on the right and one on the left.  The camper was located in between and behind the two mobile homes on the property.  It was not attached to anything.  Thinking that the CI had been referring to the camper when he/she reported seeing Eaves walking around a "trailer," Farris, Bloss and Cantrell did a "bang," on the camper.  A "bang" is a procedure in which they bang on the windows and doors for an extended period of time in an effort to flush out the fugitive.  The "bang" was unsuccessful.  They  tried to see inside the camper but could not because of curtains. The door was not locked, and Farris and Bloss decided to enter the camper to look for Eaves. She testified that law enforcement did not direct her or any of the other bonding agents to go into the camper.

The camper was outfitted with a seating area covered by a foam pad. A storage compartment was located under the seating area. Based on her past experience, Farris knew that fugitives sometimes would hide in this storage area, so she decided to look inside the storage area. As she started to pull back the padding on the seating area to open the storage bin, she saw a gun[1] and secured it for their safety. At that point, they called a "stop," meaning they discontinued their search for the defendant and began to search the camper for any other weapons in order to ensure their safety. In doing so, Farris opened drawers and containers looking for another weapon. She found drugs and pills "scattered" about and in drawers of the camper and a fanny pack resting on a bench in the camper. The fanny pack was open and when she picked it up the contents fell out including a clear plastic baggy containing a white powdery substance. She put everything back in the fanny pack and put it on the table. Farris also saw on the table a handwritten receipt and other documents pertaining to the camper indicating that a person whom Farris recognized as the defendant's mother had purchased the camper. The only item Farris took out of the camper was the gun; she left everything else inside the camper.

While the bonding agents were looking inside the camper, a Lincoln County Sheriff's Department deputy was parked in his patrol car on the roadway in front of the property at 298 Camargo Road. Farris took the gun to the deputy, but he said he could not take it until he had confirmed that there were arrest warrants outstanding for the defendant. Farris then put the gun in the trunk of her vehicle for her safety and the safety of the other bonding agents. Farris also

---

[1]The government has identified this gun as a Glock .40 caliber semi-automatic pistol. *See* government's response to defendant's motion to suppress at 1, Doc. 18.

informed the deputy that she had found a receipt for the camper made out to the defendant's mother, and she saw drugs inside the camper.

After Farris secured the gun in her vehicle, she, Bloss and Cantrell stood outside the camper discussing their options. A woman and a man arrived separately on the property. Farris does not remember which one arrived first, but she learned they lived in the mobile home on the left side of the property if one is facing the front property line of 298 Camargo Road. They also learned that the people living in the mobile home on the right side of the property were related to the people living in the other mobile home on the property. The CI came out of the woods and told the bonding agents that Eaves was in one of the mobile homes. Farris was able to secure consent of the occupants to search the mobile home on the right side of the property. They did so and did not find Eaves. The CI had originally told Farris that the defendant was staying in a "trailer" which is why they had gone to the camper first, but actually the CI had been referring to one of the mobile homes on the property. The man and woman who had just arrived on the scene and lived in the mobile home on the left side of the property would not give the bonding agents consent to search their mobile home. More personnel from the Lincoln County Sheriff's Department arrived. They secured the gun from Farris and obtained consent from the man and woman to search their mobile home. Deputies found Eaves and his girlfriend inside the bathroom shower fully clothed. Farris also testified that law enforcement entered the camper before Eaves was found but after she had secured the gun in her vehicle. While law enforcement was inside the camper, she stood on the metal steps of the camper just outside the door and described what she had found to the officers including the handwritten receipt for the purchase of the camper.

Chief Deputy Bill Reavis (Reavis) of the Lincoln County Sheriff's Department testified to the following: He received a telephone call from Deputy David Miller (Miller) on September 26, 2006, informing him that bonding agents had gone to 298 Camargo Road with warrants for Justin Eaves' arrest. Reavis told Miller that until they received confirmation about outstanding arrest warrants, Miller must not become involved in the attempt to locate and apprehend the defendant. Murray County and Giles County Sheriffs' Departments then faxed confirmations of the arrest warrants. At that point, Reavis along with Lincoln County Sheriff Murray Blackwelder went to the scene at 298 Camargo Road. While en route, Reavis contacted Deputy Chad Townsend who was also on his way to 298 Camargo Road to tell him they had warrants in hand and were on their way also.

The camper at issue in this case was located between the two mobile homes on the property at 298 Camargo Road. When Blackwelder and Reavis arrived, Deputies Townsend and Miller and Shawna Poole were present as well as two state troopers sitting in a patrol car parked on the road. Reavis and Blackwelder talked to Shawna Poole who telephoned her husband, Jonathan Poole, at work. Jonathan came home from work and talked with Reavis and Blackwelder in the front yard of the property.

During the October 11, 2007 suppression hearing, the following dialogue took place between defense counsel and Reavis:

Q. And at that time, you ascertained that Mr. Poole is the owner, at least of one of the mobile homes?

A. Yes, he advised that he owned that property there where we were standing.

Q.  Okay.

A.  Within that area right there.

Q.  But there are multiple homes, individual living dwellings on that same area basically?

A.  It's how you want to infer it.

(Tr. 47-48).

Reavis further testified he could not remember whether Jonathan specified that he did not own one of the mobile homes.  Jonathan gave him permission to search anything he did own and he signed a consent to search form.  Reavis does remember that "Mr. Poole also advised that the camper trailer was his." (Tr. 52).  Jonathan explained that he had picked up the camper only a few days before.  He further informed Reavis that the defendant and his girlfriend had arrived the night before and needed a place to stay. Jonathan had allowed them to spend the night there in the camper on September 25, 2006.  Reavis and Blackwelder, who had been told drugs were inside the camper, asked for and Jonathan gave his consent to search.  He signed a written consent form.  As Reavis stood outside looking into the open door of the camper, he could see drug items on the table of the camper.  Deputies Townsend and Reavis searched the camper and found drugs in a large bag on the table and in the kitchen.  Reavis did not recall seeing a receipt regarding who owned the camper and he did not "ever make any effort to verify the registration of the camper."  (Tr. 50).

### *Sheriff Murray Blackwelder*

Sheriff Murray Blackwelder (Blackwelder) of the Lincoln County Sheriff's Department testified to the following: He has been the sheriff since September 1, 2006.  Blackwelder accompanied Reavis to 298 Camargo Road, Fayetteville, Tennessee on September 26, 2006, after

they received confirmation about outstanding warrants for the defendant's arrest.   When they arrived, there were at least four other law enforcement officers and bonding agents there.  Jonathan Poole arrived after Blackwelder.  Jonathan gave the officers consent to search "the premises." (Tr. 55). Blackwelder could not remember having any conversation with Shawna Poole about the ownership of the camper in question.  He did remember having a conversation by telephone with the defendant's mother regarding the ownership of "another trailer but not the camper" in question.  (Tr. 59). This trailer was a small, enclosed cargo trailer meant to be towed behind a car and which held a "bunch of merchandise" in it.  (Tr. 60).  It was not intended for a person to stay in it.  *Id.*  Blackwelder cut the lock off this trailer and found guns in it. Officers did search the camper on the property.  (Tr. 55).  Jonathan told Blackwelder that he had picked up the camper in question a few days before and brought it to the property.  When asked, Blackwelder stated he did not remember that Jonathan said he did not own the camper and that he could not search it.  Jonathan did tell Blackwelder that the defendant and "the female" had arrived the night before and he had given them permission to stay in the camper.  (Tr. 65).

*Dorothy Mushenski*

Dorothy Mushenski (Mushenski) testified for the defense to the following: The defendant, Justin Eaves, is her son. On September 26, 2006, Shawna Poole called and said that deputies and bonding agents were on site at 298 Camargo Road and the bonding agents had broken down the door of her camper. Shawna informed Mushenski that she had told the deputies that the camper belonged to Mushenski, and Shawna tried to get them to call Mushenski but they would not do so.  Mushenski testified that she had bought the camper for her restaurant equipment business on a Friday.  Mushenski had received or won a large contract for her

business in Jackson, Mississippi that required she have a camper on site. She was driving to Athens, Alabama from Nashville, Tennessee to pick up her grandchild when she saw the particular camper in question for sale by the side of the road. The owner would not take a check or credit card so she drove to a bank and obtained cash to pay for the camper. She left the bill of sale and the title to the camper, which had no tag, with the person from whom she bought the camper. That person put the paperwork in the camper to give to Jonathan so that if Jonathan were pulled over while towing the camper, he could provide the paperwork to the police. The Lincoln County Sheriff's Department has held that paperwork as evidence and refuses to return it until this case has been resolved. She did ask for and receive her lawnmower from the Lincoln County Sheriff's Department. She later gave the bank receipt, showing the cash with which she bought the camper, to a Mr. Dipillo with the Federal Defender Services.

Mushenski's vehicle did not have a trailer hitch on it so she called her nephew, Jonathan Poole, to come retrieve it for her. On or about the next day, Saturday, Jonathan did retrieve the camper and brought it to his house in order that he could have a friend of his, who does bodywork, paint the camper and make some minor repairs. She did not have any discussion with Jonathan about his purchasing the camper.

On September 26, 2006, Mushenski received a telephone call from Jonathan's wife, Shawna. Mushenski could hear Shawna say to someone she assumed was a law enforcement officer that she had the owner on the phone and "you need to talk to her." (Tr. 72). Mushenski heard someone say "no." She then tried to call Sheriff Blackwelder but was told he wasn't in. She wanted to leave a message for the Sheriff but she was told she had to call back. She then called Shawna back and could hear yelling and a lot of talking in the background. Shawana was

very upset so Mushenski hung up. Mushenski did not own another trailer on the premises, but she did own a lawn mower on the premises although she could not say where it was stored. She did not have any conversation with anyone that day from the police about her property or any trailer or camper on the property. (Tr. 76). Presently, the camper is in Jackson, Mississippi. When Mushenski obtained the camper from the Lincoln County Sherriff's Department, she had to have the door replaced because the lock inside the door knob had been broken and the knob itself had been broken off.

### Shawna Poole

Shawna Poole also testified for the defendant at the hearing. She is Jonathan Poole's wife. Mr. and Mrs. Poole live on the property in question in a mobile home with their two children. If one is standing on Camargo Road facing the front property line of 298 Camargo Road, Shawna and Jonathan live in a mobile home on the left, and Jonathan's parents live in a mobile home on the right. On September 26, 2006, Shawna received a telephone call at work. She was informed that there were police at her house. She went home and saw two police cars parked on the street. Bonding agents were walking out of her parent's-in-law mobile home, and they had already searched the camper. She saw Deputies Townsend and Miller walking from behind her mobile home where the camper is located. They said they had a warrant for Justin Eaves and asked if they could go inside her home to get Justin. She said "yes" but asked them not to "trash" her house. (Tr. 81). They did not ask her for permission to search the camper or any other trailer. Justin Eaves was arrested inside her home and placed in a police car. Shawna then called the defendant's mother and her husband, Jonathan, to tell them what was happening. Blackwelder and Reavis also arrived and "they were asking me whose everything was and I gave them phone

numbers." (Tr. 82). She explained that the land belonged to Jonathan's parents and that the mobile home where she and her family lived belonged to her mom. Sheriff Blackwelder then said "what about the camper out back, and I told him, I said Justin's mom, Dorothy, owns the camper and he said can I get names and phone numbers." (Tr. 83). Shawna gave Blackwelder the phone number to Jonathan's mom and dad at work and their cell numbers. Shawna further told Blackwelder and Reavis that she had just gotten off the phone with Justin's mom, she had the telephone number, and she would be glad to call her back and let them speak to her. They declined the offer. Shawna was not aware that Mushenski owned any other structures on the property besides the camper.

### *Jonathan Poole*

Jonathan Poole testified to the following: He lives in one of two mobile homes located at 298 Camargo Road, Fayetteville, Tennessee. His parents occupy the other mobile home on the property. When facing the front of the property from Camargo Road, he lives in the mobile home on the left and his parents live in the mobile home on the right. On September 26, 2006, his wife, Shawna, called and said law enforcement officers were at the house and Justin was in custody. It was close to his lunch break, and Jonathan decided to come home. When he arrived he saw state troopers, Lincoln County deputies, the sheriff, and bonding agents at the property. Chief Deputy Bill Reavis asked Jonathan for consent to search his property. (Tr. 88). Jonathan told Reavis that his property consisted of his home, which he referred to as a trailer; his vehicle; and his outdoor utility shed. (Tr. 88). He was specific with the officers about what buildings he owned and did not own. (Tr. 89). Blackwelder and Reavis specifically asked for permission to search the camper, and Jonathan told them he did not own the camper, that it belonged to his

aunt, that he had retrieved it for her from Athens, Alabama, and that he was trying to get someone to work on it for her. He did not give the officers permission to search the camper. He stated he had had the camper there about two days and that, when his aunt was no longer using it, he might then buy it from her. He testified he thought she might be through with the camper in two or three months. He had placed the paperwork to the camper inside the camper so that if he were stopped when towing the camper to Camargo Road, he could show the police the paperwork. The keys were also inside the camper, and the door was not locked. He also told Blackwelder and Reavis that when he picked up the camper, there was only furniture in it. (Tr. 92). The defendant had been staying with him for two or three days before September 26, 2006. (Tr. 96). During that time, defendant stayed on one couch and his girlfriend stayed on another couch in Jonathan's mobile home until a room could be freed up in the mobile home for them. Jonathan told the officers that the defendant had stayed in the trailer, meaning his mobile home. He did not tell Blackwelder and Reavis that the defendant stayed in the camper. (Tr. 95). Jonathan did not think the defendant stayed in the camper, but defendant had "free rein" to stay wherever he could find a place to sleep including the camper, and Jonathan did not go in and out of the camper on a regular basis. (Tr. 99-100). The defendant brought with him a truck and a cargo trailer with his personal belongings in them. Jonathan told Blackwelder and Reavis that the truck and the cargo trailer were defendant's. Following the search of the camper on September 26, 2006, Jonathan observed the back door of the camper's storage area was busted, but he was not aware if anyone had broken the front door of the camper.

After talking with Blackwelder and Reavis about what properties he owned and did not own, Jonathan told police they could search his mobile home, his utility shed, and his truck. (Tr.

97). Jonathan also signed a written consent form to search his property by which he meant his mobile home, his vehicle, and his utility shed. The written consent is a standard form with blanks to write in the name of the person consenting, the names of the officers who are being given consent, the place to be searched, and the time and date the form was completed. (*See* Gov. Ex. 1). The form which Jonathan signed states Reavis and Blackwelder have permission to search "the premises and property, including all buildings and vehicles, both inside and outside of the property located at <u>298 Camargo Rd.</u>" (Gov.'s Ex. 1). "298 Camargo Rd" is handwritten onto a blank in the typed form.

### *ATF Special Agent Stephen Gordy*

Alcohol, Tobacco and Firearm (ATF) Special Agent Stephen Gordy testified to the following: Special Agent Gordy spoke with the defendant's girlfriend, Shareian Moorehead, after the September 26, 2006 incident. According to her, Justin Eaves picked her up at 8:30 pm on September 25, 2006. He told her he wanted to stay and see her one more time before he turned himself in. They spent the night in the camper on September 25, 2006.

### III. Analysis

In his motion, the defendant originally asserted that any statement made by him during an interview on or about November 3, 2006, with ATF Special Agent Gordy should be suppressed because the interview was conducted after charges were brought, the defendant refused to sign a waiver of rights, and defendant's counsel was not present. At the October 11, 2007 hearing, however, the government stated it does not intend to use any of the defendant's statements made during this interview and argued the issue is moot. Counsel for the defendant agreed that since the government would not use any statements made during Special Agent Gordy's interview with

the defendant on or about November 3, 2006, the issue was moot. Accordingly, the undersigned declines to address the issue of the admissibility of the statements because the issue is moot. Further, defendant's counsel stated at the hearing that the defendant was not seeking suppression of the firearm found by Debbie Farris in the camper. The undersigned now turns to the only issue remaining in this motion to suppress: whether the contraband found in the camper on September 26, 2006 is admissible at trial or should be suppressed.

Searches that are not conducted pursuant to a valid search warrant "are *per se* unreasonable under the Fourth Amendment subject to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347 (1967); *see also, United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999). One of these "well-delineated exceptions is a search conducted pursuant to voluntary and valid consent." *Worley*, 193 F.3d at 386. It is the government's burden to prove by a preponderance of the evidence with the use of clear and positive testimony that a valid and voluntary consent was obtained. *Id.* at 386 (citing *Bumper v. North Carolina*, 391 U.S. 543 (1968)). "Whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Worley*, 193 F.3d at 384 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).

There is no dispute that Jonathan Poole gave voluntary consent to search; rather, the disagreement centers on the places for which Jonathan gave his consent to search. The written consent form which Jonathan Poole signed states Deputy Reavis and Sheriff Blackwelder have permission to search "the premises and property, including all buildings and vehicles, both inside and outside of the property located at 298 Camargo Rd." (Gov.'s Ex. 1). However, both Shawna

Poole and Jonathan Poole testified that prior to Jonathan's signing the consent form, they told Deputy Reavis and Sheriff Blackwelder that the camper at issue belonged to Dorothy Mushenski, the defendant's mother. Jonathan Poole also testified that he told the officers they could search the places he owned and where he lived, *i.e.*, the mobile home where his family lived, his vehicle, and his utility shed and that the consent to search form was directed at those places. Mushenski testified that she heard Shawna Poole over the telephone tell someone that she (Shawna) had the camper's owner on the phone and could talk to that person if the person desired. Mushenski further testified she heard someone respond "no" to Shawna's request. On the other hand, Deputy Reavis testified that he asked Jonathan if the camper was his and Jonathan said it was and gave consent to search the camper. According to Sheriff Blackwelder, Jonathan gave consent to search the camper.

The Pooles' and Mushenski's testimony directly conflicts with Deputy Reavis' and Sheriff Blackwelder's testimony. The former group of witnesses testified that law enforcement was told Mushenski owned the camper, not Jonathan. The latter group of witnesses testified that Jonathan said he owned the camper and specifically gave consent to search the camper. This credibility issue is a difficult one which I do not address lightly. After considering the totality of the circumstances, and in particular the testimony of Debbie Farris, I credit the Pooles' version of events, especially as it relates to whether Jonathan told police he owned the camper and could search it.

As a bonding agent looking to apprehend the defendant on September 26, 2006, if Debbie Farris had any bias in favor of any party or witness in this case, it would have been for the police. She certainly exhibited no bias in favor of the defendant, yet her testimony supports Jonathan's

testimony that he told police he did not own the camper. Farris testified that she found inside the camper paperwork including a receipt indicating that the camper had been purchased by a person whom she recognized as the defendant's mother. She relayed this information to a Franklin County deputy on the scene before Reavis and Blackwelder arrived. Further, Jonathan and Mushenski testified consistently with each other and Farris that the sales receipt for and title to the camper made out to Mushenski were located inside the camper. It seems incredible to me that Jonathan would have informed the officers that the camper belonged to him when a receipt and title for it in Mushenski's name were located just inside the camper. Further, Jonathan had no incentive to tell the officers that the camper was his. I do not credit Deputy Reavis' testimony that Jonathan said the camper was his. Rather, I credit Jonathan's testimony that he told Reavis and Blackwelder the camper belonged to the defendant's mother, not him. I also credit Jonathan's testimony that he told Reavis and Blackwelder they could search the mobile home where his family lived and the property on the premises that he owned, *i.e.*, his vehicle and the utility shed.

At the suppression hearing, there was some confusion over which piece of property the witnesses were referring to by the use of the word "trailer." The word "trailer" was sometimes used to refer to the camper, to the mobile home, and to the cargo trailer. Even the bonding agents were confused upon their initial arrival at Camargo Road on September 26, 2006 regarding the whereabout of the defendant because their CI had told them the defendant was in the "trailer." The bonding agents interpreted "trailer" to mean camper when, in fact, the CI meant the defendant was in a mobile home. The government argues that a similar mix-up could have caused Reavis and Blackwelder to believe that Jonathan had said he owned the camper and

15

could search it.  I do not find that argument persuasive.  When the CI communicated to the bonding agents that the defendant was in the "trailer," the bonding agents were not on site at 298 Camargo Road and, obviously, neither were the attorneys and witnesses in the courtroom during the suppression hearing.  Reference to a "trailer" in the abstract when there are several different types of trailers one could be referring to *is* confusing.  But in Jonathan's case, he, Reavis, and Blackwelder were standing there on the property undoubtedly looking together at each mobile home/trailer/camper as Jonathan was asked, in turn, who owned what particular piece of property. Jonathan testified he was specific as to what structures he owned and did not own. Because Reavis, Blackwelder and Jonathan could see each structure there on the property as they talked about them, I conclude Jonathan's assertion that he did not own the camper was, or at the very least, should have been clear to Reavis and Blackwelder.  Further, though not dispositive on this issue, I note that neither Reavis nor Blackwelder themselves testified that they had become confused on September 26, 2006 concerning the structures Jonathan said he owned.

Finally, the government also argued at the suppression hearing that Jonathan Poole had actual authority or, at the very least, apparent authority to give consent to search the camper because the camper was in his control and care on September 26, 2006. A third party possesses actual authority to give valid consent to search in conformity with the Fourth Amendment where the third party has joint access or control for most purposes over the premises or effects to be searched.  *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974); *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007); *Johnson v. Weaver,* 2007 WL 2780914 *3 (6th Cir. Sept. 24, 2007) (unpublished).  As evidence of this control, the government observes that Jonathan gave the

defendant permission to stay in the camper.[2]  Further, "a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search."  *Ayoub*, 498 F.3d at 537 (citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) and *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990)).

Even if one were to assume that Jonathan had actual or apparent authority to give consent to search the camper, the fact remains that Jonathan did *not* give consent to search the camper. When Blackwelder and Reavis asked for consent to search the camper, Jonathan responded by telling them that he did not own the camper, that the defendant's mother, Mushenski, did. Jonathan told them they could search his trailer, his vehicle, and his utility shed.  He did not say they could search the camper.  He then signed the general consent to search form. Based on the totality of these facts, no reasonable officer could conclude that by signing the consent form Jonathan intended to give and knowingly gave consent to search the camper.

---

[2]While Jonathan evaded specifically testifying that he gave the defendant permission to stay in the camper, he did eventually testify that he gave defendant permission to sleep wherever he could find a place, thus, I conclude he did inform the defendant he could stay in the camper.

## IV. Conclusion

Based on the totality of the circumstances, the undersigned concludes the government has failed to meet its burden to prove by a preponderance of the evidence with the use of clear and positive testimony that a valid and voluntary consent was obtained to search the camper at issue. Accordingly, it is RECOMMENDED that defendant's motion to suppress evidence be GRANTED and drug contraband and evidence of drug contraband found by law enforcement inside the camper at 298 Camargo Road in Lincoln County, Tennessee on September 26, 2006, be SUPPRESSED.[3]

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[3]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).